IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

KARSTEN O. ALLEN,           )
                                  )
           Plaintiff,        )     Civil Action No. 7:22-cv-00408
                                  )
v.                           )     **MEMORANDUM OPINION**
                                  )
CHAROLETTE SHELTON, *et al.*,   )     By: Hon. Thomas T. Cullen
                                  )        United States District Judge
           Defendants.     )

     Karsten O. Allen ("Allen"), a Virginia inmate proceeding *pro se*, filed this civil rights action under 42 U.S.C. § 1983 against five Virginia Department of Correction ("VDOC") and Keen Mountain Correctional Center ("Keen Mountain") staff.[1] Allen alleges that, in retaliation for his filing lawsuits against VDOC staff, the defendants conspired to and ultimately succeeded in transferring him from Keen Mountain, a level 3–4 security facility, to Wallens Ridge State Prison ("Wallens Ridge"), a level 5 maximum security (and therefore less desirable, according to Allen) facility, in violation of his First Amendment rights. (*See* Compl. [ECF No. 1].) Because Allen has failed to put forth evidence of his claims against defendants Pozeg, Beunaga, Breeding, and Parr, the court will grant them summary judgment on Allen's claims against them. But Allen has raised a genuine dispute of material fact against defendant Shelton; the court will therefore deny the motion for summary judgment as to the claims against her.

---

[1] The five defendants are: (1) Charolette Shelton, Keen Mountain Unit Manager ("Shelton"); (2) Michael Pozeg, Keen Mountain Chief of Housing and Programs ("Pozeg"); (3) Barbara Beunaga, VDOC Central Classification Services ("CCS") Manager ("Beunaga"); (4) K. Breeding, Keen Mountain Grievance Coordinator ("Breeding"); and (5) Curtis Parr, VDOC Western Region Ombudsman ("Parr").

Shelton is no longer employed by VDOC. (Aff. of C. Shelton ¶ 1, Jan. 6, 2023 [ECF No. 42-1].)

# I.   BACKGROUND

Allen alleges that he was administratively transferred from Sussex I State Prison ("Sussex I") to Keen Mountain on February 21, 2020. Keen Mountain is a security level 3–4 prison. (*See* Defs.' Mem. Supp. Mot. Summ. J at 14 [ECF No. 42].) As he describes it, Keen Mountain staff immediately and expressly labeled Allen and his fellow transferee inmates as the "worst of the worst" and gave them an intake speech about how they would not "get away with" their past misconduct at Sussex I.

Allen alleges that his problems with VDOC staff began shortly after his arrival at Keen Mountain. Specifically, Allen contends that when he requested an "interim review that would correct the results of Plaintiff's last annual review to reflect an expungement of a disciplinary conviction[,]" it was denied. (Compl. ¶ 11.) Thereafter, Allen alleges that Keen Mountain staff began mistreating him in various ways.[2] As it relates to *this* lawsuit against *these* defendants,

---

[2] Allen alleges that various VDOC staff members harassed him, verbally threatened him, taunted him with the nickname "the lawyer," assaulted him, filed false disciplinary charges against him, wrongfully housed him in segregation, and unlawfully confiscated his property. (*See generally* Compl. at 1–13.) None of these general allegations are the subject of this lawsuit, nor has Allen asserted any claims on these grounds against any of the named defendants. (*Id.*) For example, although Allen complains at length about a VDOC employee named Fields (*see id.*), Fields is not a defendant in this case. Allen also complains about "the most aggressive officers such as Ofc. Hess and Sgt. Waldron" (*id.* ¶ 28), but, again, these individuals are not defendants. As another example, Allen makes allegations about "[a] select group of officers" who harassed him, but he does not identify them. (*Id.* ¶ 23.)

       This lawsuit is one of many that Allen has filed in recent years while incarcerated, and the court is aware that some or all of these complaints generally reiterated in the instant complaint have been or remain the subject of other cases. (*See* Compl. ¶ 25 (listing at least some of Allen's federal lawsuits).)

And although he alleges that $180 worth of property was effectively confiscated when he was transferred, Allen does not assert a due process claim as a result. Moreover, the property he complains about was listed on a VDOC form under Operating Procedure ("OP") 802.1 where Wallens Ridge, upon Allen's intake, informed him that those items were contraband and that he was unauthorized to possess them at the new facility. (*See* ECF No. 47-2, at 18.) Allen was provided with and notified of the process by which he could have appealed this contraband property confiscation—through the Offender Grievance Procedure or to his Facility Unit Head—but there is no evidence that he did so. (*Id.*) And Allen concedes that the confiscated property consisted

Allen alleges that they retaliated against him for filing complaints, grievances, and—as Allen describes it—a "barrage" of lawsuits against prison staff by transferring him to a maximum-security facility and rejecting his related grievances. (*See* Allen's Mem. Opp'n Mot. Summ. J. at 11 [ECF No. 47-1].)

As to defendant Shelton, Allen alleges that, when he was transferred to Keen Mountain's B-Building on May 25, 2021, Shelton—the Unit Manager—told him that she would "get [him] eventually." (Compl. ¶ 31.) He alleges that Shelton knew that Allen had sued her and many of her colleagues for their alleged misconduct. He alleges that Shelton improperly conducted his 2021 year-end Annual Review—the VDOC procedure that determines, among other things, inmates' security-classification level and whether they are recommended for transfer to another facility—resulting in his security-level upgrade and subsequent transfer to Wallens Ridge, and that she did so in retaliation for his grievances and lawsuits against her.

In response, Shelton explains that she was the Institutional Classification Authority ("ICA") at Keen Mountain and, in that role, she conducted Allen's 2021 Annual Review on December 9, 2021. (Shelton Aff. ¶¶ 4–5.) According to Shelton, two of the Annual Review's purposes are to determine the inmate's appropriate security level and whether the inmate meets the criteria for a transfer to another facility. (*Id.* ¶ 4.) She explains that she recommended Allen's change from Security Level ("SL") 4 to SL5 because he scored 44 points on the Security

_____

of items "not permitted at level 5 institutions." (Compl. ¶ 41.) Nevertheless, the court considers Allen's property-confiscation allegation insofar as he offers it in support of his claim that being transferred and losing property to which he would otherwise be entitled to retain could chill his expression of his First Amendment rights.

Reclassification Scoring Instrument,[3] placing him in the SL5 range under VDOC Operating Procedure ("OP") 830.2, Security Level Classification. (*Id.* ¶ 5.) During the review period, Allen received five "200 series" disciplinary convictions and two "100 series" disciplinary convictions, resulting in an increase in his security score from SL4 to SL5. (*Id.*) Also contributing to Allen's SL5 designation was the fact that he had not held a job during the annual reporting period. (*Id.*) On the basis of these facts, she claims, she recommended that Allen be transferred to one of the three VDOC facilities that house SL5 inmates.

But Allen contends that VDOC staff can utilize security-level overrides to keep an inmate classified at a lower security level even if their Annual Review justifies a higher security-level classification. Allen explains that he had received security-level overrides multiple times in the past to keep him at a lower security level, even when his score justified a higher one. (*See* Allen's Mem. Opp'n Mot. Summ. J. at 17.)

Moreover, Allen alleges that, prior to his 2021 Annual Review, he "met with [VDOC] Counselor [Christopher] Cox in preparation for the review . . . [and that] Cox . . . explained to [him] that Cox would not be recommending any significant changes and because [Allen] incurred [disciplinary] charges during the period he would remain on ESC [Security] level 4 and not be eligible for transfer. Cox explained that he would utilize a security[-]level override to keep [Allen] at [Keen Mountain] although he was scoring SL5 . . . ." (Compl. ¶ 33; *see also* Case Plan Agreement, Dec. 6, 2021 [ECF No. 47-2, at 23]; Allen Aff. ¶ 6, Feb 8, 2023 [ECF No. 47-3].)

---

[3] This is used at the Annual Review to determine an inmate's security classification level. (Shelton Aff. ¶ 5.)

After his review was completed, Allen says that he repeatedly asked Cox and another VDOC employee—Counselor Cordle—for the results of his 2021 Annual Review, but that neither would give it to him, instead only telling him that "[s]omething happened with your annual. You must have pissed someone off[,]" or making excuses like forgetfulness or that their printer was broken. (Compl. ¶¶ 34–35.) Allen was thereafter called to the Keen Mountain property department on March 31, 2022, to be "'packed up' for transfer." (*Id.* ¶ 37.) Allen alleges that two other inmates were prepared for transfer on Shelton's recommendation after suing VDOC employees for misconduct. (*Id.*) Allen alleges that, while he was conversing with those other two inmates, Shelton said to him, "I told you I'd get you." (*Id.* ¶ 38.) He adds that he later saw two inmates in Shelton's office looking at her computer screen and that one of them later told Allen that she had discussed Allen's "frivolous lawsuits" with the inmate, despite Allen never revealing his lawsuits to the inmate. (*Id.* ¶ 39.) Allen was transferred to Wallens Ridge the next day.

Once at Wallens Ridge, Allen requested and finally received a copy of his 2021 Annual Review. (*Id.* ¶ 42.) The defendants provide (as does Allen) the record of it. It states, in pertinent part:

| | | DOC-11H |
|---|---|---|
| Virginia Department of Corrections | | DOC Location: Office of Attorney General |
| | | Report generated by Tyler, P L |
| **Institutional Classification Authority Hearing** | | Report run on 12/09/2022 at 09:21 AM |

| Offender Name: Allen, Karsten O | DOC#: 1333187 | DOC Location: Keen Mountain Correctional Center | Bed Assignment: B-1-119-B |
|---|---|---|---|

**Part I: ICA Referral Notice**

You were scheduled to appear before the Institutional Classification Authority on or after 12/10/2021 for Good Time Level, Security Level, Transfer

Comments: Annual Review

Authorizing Staff                                     Date & Time

Hearing Date:

Offender Statement:

Reporting Staff Comments:

**Part II: Hearing Disposition**

**Good Time Level Review:**

The ICA recommends: Class Level change to Level 4

Rationale: Recommend No Change in GCA Class level from 4 at this time. Based on scores and adjustment, inmate scores CL 4 with 40 points and this is appropriate. During the review period inmate received two 100 series and five 200 series infractions. Inmate was waitlisted for programming, but did not hold a job. No Change GCA 4.

| ICA: Shelton, Charlotte L | Date: 12/9/2021 |
|---|---|

**Administrative Review:**

| Decision: Approve | Class Level change to Level 4 |
|---|---|
| Pozeg, Michael | Date: 12/28/2021 |

Comments: No Change in GCA Class level from 4 at this time. Based on scores and adjustment, inmate scores CL 4 with 40 points and this is appropriate. During the review period inmate received two  100 series and five 200 series infractions. Inmate was waitlisted for programming, but did not hold a job. No Change GCA 4.

**Security Level Review:**

The ICA recommends: Security Level change to 5 - Maximum

Rationale: Recommend Change in Security Level from 4 to 5 at this time. Inmate scores SL 5 with 44 points. During the review period inmate received five 200 series and two 100 series infractions. Inmate was waitlisted for programming, but did not hold a job. Inmate is more suitable for SL5 placement.

| ICA: Shelton, Charlotte L | Date: 12/9/2021 |
|---|---|

**Administrative Review:**

| Decision: Approve | Security Level change to 5 - Maximum |
|---|---|
| Shelton, Charlotte L | Date: 12/9/2021 |

Comments: Recommend Change in Security Level from 4 to 5 at this time. Inmate scores SL 5 with 44 points. During the review period inmate received five 200 series and two 100 series infractions. Inmate was waitlisted for programming, but did not hold a job. Inmate is more suitable for SL5 placement.

**CCS Review:**

| [X] Approve | Security Level change to 5 - Maximum |
|---|---|

Page 1 of 2                          **ENCLOSURE A**

---

| Pozeg, Michael | Date: 12/28/2021 |
|---|---|

Comments: Recommend Change in Security Level from 4 to 5 at this time. Inmate scores SL 5 with 44 points. During the review period inmate received five 200 series and two 100 series infractions. Inmate was waitlisted for programming, but did not hold a job. Inmate is more suitable for SL5 placement.

**Transfer Review:**

The ICA recommends: Transfer to Red Onion State Prison, Sussex I State Prison, Wallens Ridge State Prison

Rationale: Recommend Annual Review Transfer to SL5 facility due to inmate's scoring for SL 5.

| ICA: Shelton, Charlotte L | Date: 12/9/2021 |
|---|---|

**Administrative Review:**

| Decision: Refer to CCS | Transfer to Red Onion State Prison, Sussex I State Prison, Wallens Ridge State Prison |
|---|---|
| Pozeg, Michael | Date: 12/28/2021 |

Comments: Recommend Annual Review Transfer to SL5 facility due to inmate's scoring for SL 5.

**CCS Review:**

| [X] Approve | Transfer to Sussex I State Prison, Wallens Ridge State Prison |
|---|---|
| Buenaga, Barbara A | Date: 12/30/2021 |

Comments: Inmate's SL increased at AR from 4 to 5. ROSP removed from approved locations due to inmate's Medical Loc Code E.
Inmate has 20 years and 5 months remaining on sentence.
General Risk of Recidivism: High  - Re-Entry services/transfer not required yet.
Inmate is not on CFD.
Inmate has no restrictions for bunk assignment.
RD 6-24-2042
HP Newport News Va

(Karsten O. Allen 2021 Annual Review, Dec. 9, 2021 [ECF No. 42-1, at 5–6].) Allen alleges

that, upon reviewing his 2021 Annual Review, he discovered that Shelton improperly

conducted his Annual Review, recommended increasing his Security Level from SL4 to SL5, and transferring him to an SL5 facility after she learned that he had sued her in federal court. (Compl. ¶ 42.) Allen alleges that he also discovered that Shelton had "deleted" the "security [-]level override" recommendation that Counselor Cox had told Allen he was going to enter and replaced it with her own SL5 and transfer recommendation. (*Id.*) He claims that Counselor Long at Wallens Ridge told him that "it looks like someone deleted" Part I of his 2021 Annual Review—where he alleges that Counselor Cox recommended an SL4 override. (*See* Allen's Mem. Opp'n Mot. Summ. J. at 16.) Allen's argument is essentially that, although his disciplinary score qualified him as an SL5 inmate, Shelton refused to exercise a routine security-level override to nevertheless keep him at the security level 3–4 facility where he was housed (and deleted Counselor Cox's recommendation to that effect) to retaliate against him for suing her. On these facts, Allen asserts claims against Shelton for retaliation in violation of his First Amendment right to petition the government for redress of grievances and for conspiracy with the other four defendants for their executed plot to transfer him to Wallens Ridge.

Allen's only factual allegation against Pozeg is that "Shelton's recommendations [to classify him as SL5 and transfer him to an SL5 facility] were approved by defendant Pozeg . . . ." (Compl. ¶ 43.) Similarly, Allen's only factual allegation against Beunaga is that "the institution's recommendations [that he be transferred to an SL5 facility] were approved by CCS manager Barbara Buenaga [*sic*]." (*Id.* ¶ 44.) Allen's only factual allegation against Breeding is that "K. Breeding received Plaintiff grievance but returned it, citing Plaintiff needed to request for services. Plaintiff ultimately submitted a request for services to K. Breeding,

however, she was unable to identify the service." (*Id.* ¶ 46). Allen's sole factual allegation against Parr is that "Plaintiff appealed K. Breeding's decision [to reject his grievance] to Regional Ombudsman Curtis Parr who upheld Breeding's decision." (*Id.* ¶ 47.)

Allen commenced his lawsuit on July 18, 2022. After the court denied a motion to dismiss on procedural grounds, the defendants answered Allen's complaint, denying the essential allegations and asserting various defenses. (ECF No. 30.) Currently before the court is the defendants' motion for summary judgment. (ECF No. 41.) Defendants argue that the court should grant them judgment as a matter of law on each of the claims against them because: (1) Allen failed to properly exhaust his available administrative remedies at Keen Mountain under the Prison Litigation Reform Act before filing suit; (2) Allen has failed to produce sufficient facts to raise a genuine dispute of material facts as to his claims; (3) the record establishes that Allen was transferred to Wallens Ridge because his security level increased to SL5 at his Annual Review, not out of retaliation for filing lawsuits against prison staff, and because none of the defendants made the decision (or even had the authority) to transfer Allen to Wallens Ridge; and (4) they are entitled to qualified immunity. Allen opposes the defendants' motion on all points.[4]

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over

---

[4] The court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). The evidence relied on must meet the substantive evidentiary standard of proof that would apply at a trial on the merits. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

## III.   ANALYSIS

The defendants argue that the court should grant them summary judgment because Allen has failed to allege sufficient facts to state retaliation and conspiracy claims against them.

The court agrees that Allen has failed to produce any evidence to sustain his claims of retaliation or conspiracy against Pozeg, Beunaga, Breeding, and Parr[5] or a conspiracy claim against Shelton, so the defendants' motion will be granted as to each of these claims and defendants. But the court finds that there is a genuine dispute of material fact as to Shelton's motives to placing Allen in for a transfer, and the court will therefore deny the motion for summary judgment as to the retaliation claim against her.

### A.   Applicable Law

#### 1.   42 U.S.C. § 1983

Section 1983 imposes liability on any person who, acting under color of state law, deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, "a plaintiff 'must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011)). The plaintiff must also show "that the official charged acted personally in the deprivation of the plaintiff['s] rights." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *see also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

---

[5] Allen's has only expressly alleged claims of conspiracy against defendants Pozeg, Beunaga, Breeding, and Parr, *see* Compl. ¶¶ 51–54, but construing his *pro se* complaint liberally, the court treats the complaint as if it also alleges retaliation claims against these four defendants because the conspiracy was necessary to do something— here, retaliate against Allen by transferring him. Allen expressly asserts both retaliation and conspiracy claims against Shelton. (*See id.* ¶¶ 49 (retaliation), 50 (conspiracy).)

### 2.   First Amendment Retaliation

"In order to state a colorable retaliation claim under § 1983, an inmate must plausibly allege: (1) that he engaged in activity protected by the First Amendment; (2) that the defendant took some action that adversely affected his First Amendment rights; and (3) that there was a causal relationship between the inmate's protected activity and the defendant's conduct." *Carter v. Ely*, No. 7:20-cv-00713, 2022 U.S. Dist. LEXIS 45721, at *11 (W.D. Va. Mar. 15, 2022) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)).

With respect to the causation element of a retaliation claim, a plaintiff "must allege a causal connection between [his] First Amendment activity and the alleged adverse action." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). "In order to establish this causal connection, a plaintiff in a retaliation claim must show, at the very least, that the defendant was aware of [his] engaging in protected activity." *Id.* (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1988)). "'Knowledge alone, however, does not establish a causal connection' between the protected activity and the adverse action." *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). "There must also be some degree of temporal proximity" or other facts sufficient to suggest a causal connection. *Id.*

### 3.   Civil Conspiracy to Retaliate

"To establish a conspiracy under § 1983, the plaintiff must show that the [d]efendants 'acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'" *Barrett v. Pae Gov't Servs., Inc.*, 975

F.3d 416, 434 (4th Cir. 2020) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). "This is a 'weighty burden.'" *Id.*

## B.    Defendants Pozeg and Beunaga[6]

Allen's only factual allegation against defendant Pozeg is that "Shelton's recommendations [to classify him as SL5 and transfer him to an SL5 facility] were approved by defendant Pozeg . . . ." (Compl. ¶ 43.) Similarly, Allen's only factual allegation against defendant Beunaga is that "the institution's recommendations [that he be transferred to an SL5 facility] were approved by CCS manager Barbara Buenaga [sic]." (*Id.* ¶ 44.) Accordingly, Allen alleges that Pozeg's approval of Shelton's recommendation to increase Allen's security level and transfer him to a level 5 facility[7] "constituted civil conspiracy in violation of Plaintiff's 1st amendment right to petition the government for redress of grievances"[8] (*id.* ¶ 51), and that his transfer to a level 5 facility "at the behest of Charolette Shelton . . . committed by defendant Barbara Buenaga [*sic*], constituted civil conspiracy in violation of Plaintiff's 1st amendment right to petition the government for redress of grievances"[9] (*id.* ¶ 52). The record confirms

---

[6] Because the evidence is plainly lacking as to the merits of Allen's claims against Pozeg or Beunaga, the court need not consider their arguments related to exhaustion or qualified immunity.

[7] Level 5 is maximum security. *See* VDOC OP 830.2, Security Level Classification at 4, available at https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-830-2.pdf (last accessed August 11, 2023).

[8] Pozeg's affidavit confirms that his function as Chief of Housing Programs at Keen Mountain was indeed to perform his administrative review of the ICA's (Shelton's) Annual Review recommendation, and that he approved her security level increase (to SL5) recommendation for Allen based on VDOC policies, that he referred the transfer recommendation to CCS (here, Beunaga), which is standard protocol, and that he does not have authority to approve a transfer recommendation. (*See* Pozeg Aff., Dec. 29, 2021 [ECF No. 42-2].)

[9] Beunaga's affidavit confirms that, as VDOC's CCS Supervisor, her function was to review Shelton's Annual Review recommendations (and Pozeg's administrative review of it), and that she approved Shelton's recommendation to transfer Allen based on his security level increase and other relevant factors, such as his medical location code, time remaining on his sentence, general recidivism risk, diet classification, and bunk assignment classification. (*See* Beunaga Aff., Dec. 20, 2022 [ECF No. 42-5].)

Allen's allegations that this was the extent of Pozeg's and Beunaga's involvement in his transfer. (*See* Allen's 2021 Annual Review, ECF No. 42-5 at 5–6.)

Claims of retaliation by inmates are generally treated "with skepticism because 'every act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). Inmates "who claim that their constitutional rights have been violated by official retaliation must present more than naked allegations of reprisal to survive [dismissal]." *Adams*, 40 F.3d at 74. An inmate has no constitutional right to be housed or remain housed in a particular prison. *See Olim v. Wakinekona*, 461 U.S. 238, 245–48 (1983). "Thus, the mere approval of a transfer—without an intent to retaliate—does not give rise to a cognizable constitutional claim." *Carter*, 2022 U.S. Dist. LEXIS 45721, at *10 (citing *Yeadon v. Lappin*, 423 F. App'x 627, 630 (7th Cir. 2011) (noting that "prison transfers alone are insufficient" to state a constitutional claim)).

Allen's bald and conclusory allegations against Pozega and Beunaga, accepted as true, is insufficient to raise a genuine dispute of a material facts on his claims of retaliation or civil conspiracy because merely approving a transfer recommendation, without more, is insufficient to establish personal involvement in a conspiracy to transfer an inmate out of retaliation. Allen's allegations to the contrary are insufficient to carry his burden because the court is "not bound to accept as true [Allen's] legal conclusion[s] couched as . . . factual allegation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"Although an inmate may state a claim under § 1983 if the decision to transfer him was made in retaliation for exercising his rights under the First Amendment," Allen does not raise a genuine dispute of material fact related to his claim of retaliation against Pozeg or Beunaga. *Carter*, 2022 U.S. Dist. LEXIS 45721, at *10–11. Specifically, Allen has not produced any "facts sufficient to show that there was a causal connection between his grievances (or any other activity protected by the First Amendment [like filing lawsuits]) and [these defendants'] decision to approve his transfer to . . . Wallens Ridge." *Id.*; *see also Washington v. Fed. Bureau of Prisons*, No. 5:16-cv-3913, 2019 U.S. Dist. LEXIS 49984, at *25–26 (D.S.C. Mar. 26, 2019) ("[B]rief references to [prison employees] responding to Plaintiff's inmate grievance forms, and [another prison employee] signing off on a form approving a request that Plaintiff be transferred away from [the facility he was housed in], are insufficient to show the required personal involvement in the alleged deliberate indifference to Plaintiff's medical needs, and there are no allegations of sufficient personal knowledge of any wrongdoing by any subordinate to allow these supervisory officials to be held responsible for the subordinate's actions.") (cleaned up).

Allen alleges that Shelton recommended him for the April 1, 2022 transfer because Allen had sued her and her colleagues. Allen does not, however, allege that either Pozeg or Beunaga specifically knew of his lawsuits or any other protected activity or that it played any role, let alone a causal one, in approving Shelton's security level increase or transfer recommendation. Instead, he simply alleges that he sued VDOC officials, *Shelton* recommended him for a transfer out of retaliation because he sued, and that these defendants approved her recommendation. He fails to allege how they acted in concert, or even that they

did so, in fulfilling their part of the transfer process. *See Barrett*, 975 F.3d at 434. Consequently, Allen has not alleged sufficient facts, taken as true, from which the court could reasonably infer that either of them conspired to transfer him out of retaliation for filing lawsuits against prison staff.

Allen's threadbare and conclusory allegations against these defendants, taken as true, are insufficient to show that they conspired with Shelton to transfer Allen out of retaliation. *See Constantine*, 411 F.3d at 501. Accordingly, Pozeg and Beunaga will be granted summary judgment on Allen's claims against them.

## C.      Defendants Breeding and Parr[10]

Allen alleges that "K. Breeding received Plaintiff['s] grievance but returned it, citing Plaintiff needed to request for services. Plaintiff ultimately submitted a request for services to K. Breeding, however, she was unable to identify the service." (Compl. ¶ 46). Similarly, against Parr, Allen alleges only that "Plaintiff appealed K. Breeding's decision [to reject his grievance] to Regional Ombudsman Curtis Parr who upheld Breeding's decision." (Compl. ¶ 47.) Based only on these allegations, Allen alleges that "[t]he refusal to log Plaintiff's grievance [complaining of Shelton's recommendation that he be transferred] . . . committed by defendant K. Breeding constituted civil conspiracy in violation of Plaintiff's 1st amendment right to petition the government for redress of grievances" (Compl. ¶ 53), and that that Parr's "affirmance of K. Breeding's refusal to log the grievance which complained of Charolette

---

[10] Because the evidence is plainly lacking as to the merits of Allen's claims against Breeding or Parr, the court need not consider their arguments related to exhaustion or qualified immunity.

Shelton's retaliatory transfer . . . constituted civil conspiracy in violation of Plaintiff's 1st amendment right to petition the government for redress of grievances" (Compl. ¶ 54).

Allen's sparse accusations are insufficient to show retaliation or civil conspiracy by Breeding and Parr. But more fundamentally, Allen cannot pursue claims under § 1983 that officials violated prison regulations or that they returned adverse grievance responses. As with Pozeg and Beunaga, Allen does not allege that either of these defendants knew of his lawsuits or any other protected activity or that that knowledge played a role in their handling of his grievance.

Violations of internal procedural regulations or even state law by prison officials do not provide a basis for a constitutional claim under § 1983 unless the Constitution independently protects the right or procedure at issue. *See Weller v. Dept. of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990); *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) ("[P]rison officials' failure to follow internal prison policies [is] not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation."). Moreover, inmates do not have a constitutionally protected right to participate in a grievance procedure. *Adams*, 40 F.3d at 75; *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir. 1991). It follows, then, that an insufficient or unavailable grievance process does not rise to a constitutional violation.[11] *See Coward v. Clarke*, No. 7:20CV00702, 2022 WL 971987, at *3 (W.D. Va. Mar. 30, 2022) ("Accusations of improper denials of access to grievances or appeals, or of improper grievance responses . . . do not give rise to any constitutional claim actionable under § 1983."); *see also*

---

[11] As discussion more fully in section III.D.1 *infra*, the court agrees with Allen that Breeding and Parr's responses to his grievance were plainly wrong. But that plain error does not, without more, rise to the level of a constitutional violation.

*Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) ("[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process."); *Guinn v. Crumpler*, No. 7:18-CV-00274, 2020 WL 1666301, at *6 (W.D. Va. Apr. 3, 2020) (citing cases finding no right to grievance procedure access and denying liability for unsatisfactory grievance responses).

Allen also fails to allege how these defendants "acted jointly in concert" (as opposed to acting independently) to deprive him of a constitutional right. *See Barrett*, 975 F.3d at 434. These two defendants merely processed Allen's grievance about Shelton recommending him for a transfer (which is all that Allen alleges they did). That allegation, by itself, does not create a genuine dispute as to whether they acted as Shelton's co-conspirators.

Consequently, Allen has not alleged sufficient facts from which the factfinder could conclude that either of them engaged in a conspiracy to transfer him out of retaliation for filing lawsuits against prison staff. For these reasons, Breeding and Parr are entitled to summary judgment on Allen's claims against them.

In sum, Allen's complaint and brief in opposition are long on speculation but fatally short on factual assertions. Allen assumes a great deal about the motives of Pozeg, Beunaga, Breeding, and Parr, but assumptions devoid of facts to support them are insufficient to survive a motion for summary judgment.

## D.   Defendant Shelton

Allen fails to present any evidence as to how Shelton "acted jointly in concert"—or even that she did so—with her co-defendants or anyone else in transferring him, *see Barrett*, 975 F.3d at 434. Accordingly he has not raised a genuine dispute of material fact related to his

claim of civil conspiracy against Shelton and she is entitled to summary judgment on that claim.

As to his claim of retaliation, Shelton argues (1) Allen failed to exhaust his administrative remedies as to this claim, and (2) on the merits, she is entitled to judgment as a matter of law. The court addresses each argument in turn.

### 1. Exhaustion

Because the facts establish that Allen's efforts to grieve his transfer were thwarted by various VDOC employees through the issuance of defective forms and improper responses to Allen's filings, the administrative process was "not available" to Allen and exhaustion was not required.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 & 729 (4th Cir. 2008); *see Langford*

*v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow these administrative procedures, including filing within established time limits, or failing to exhaust all levels of administrative review, is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

In support of her argument that Allen failed to exhaust his administrative remedies, Shelton relies, in part, on an affidavit of defendant Breeding, the former Institutional Grievance Coordinator at Keen Mountain. (Aff. of K. Breeding ¶ 1, Dec. 28, 2022 [ECF No. 42-4].) According to Breeding, the inmate grievance procedure is governed by Operating Procedure ("OP") 866.1. (*Id.* Encl. A.) This OP "is a mechanism for offenders to resolve complaints, appeal administrative decisions and challenge the substance of procedures." (*Id.* ¶ 4.) Breeding explains that the grievance process provides corrections staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner. (*Id.*)

According to OP 866.1, prior to filing a regular grievance, "the inmate must demonstrate that he has made a good[-]faith effort to informally resolve his complaint. This may be accomplished by submitting an informal/written complaint form to the appropriate

department head." (*Id.* ¶ 6.) Within 15 days of receipt of the informal complaint form, staff should respond to the informal complaint. If an inmate is not satisfied with the staff's response to the informal complaint—or if no response is given—he may file a regular grievance and must attach "any required documentation to his attempt to informally resolve the issue." (*Id.*) The inmate is responsible for submitting the informal complaint in a timely manner so that staff can respond within the prescribed time period for filing a regular grievance.

Regular grievances must be submitted within 30 days of the incident in question. They are filed by placing them in the Grievance Mailbox at the institution; "[i]f the offender has transferred, the Institutional Ombudsman should send the Regular Grievance with the corresponding supporting documentation to the institution where the issue originated for resolution." (*Id.* Encl. A.) Regular Grievances "that do not meet the filing requirements of OP 866.1 are returned to the inmate within 2 working days from the date of receipt noting the reason for return on the intake section of the grievance form." (*Id.* ¶ 7.) "Reasons include, but are not limited to, . . . request for services," and "[t]he inmate is instructed how to remedy any problems with the grievance when feasible." (*Id.*) If an inmate wishes to review the intake decision on any Regular Grievance, he may send it to the Regional Ombudsman for review. "There is no further review of the intake decision. Appealing the intake decision does not satisfy the exhaustion requirement." (*Id.*)

If the grievance is accepted at intake, "there are 3 levels of review available . . . . Level I reviews are conducted by the Warden or Superintendent of the prison." (*Id.* ¶ 8.) If the inmate is dissatisfied with the decision at Level I, he may appeal to Level II; Level II reviews are conducted by the Regional Administrator, Health Services Director, Chief of Operations

for Offender Management Services, or Superintendent for Education, as the case may be. "For most issues, Level II is the final level of review." (*Id.*) "For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts a review of the regular grievance." (*Id.*) Each level has a deadline for a response: Level I, 30 days; Level II, 20 days; and Level III, 20 days. "Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal." (*Id.*)

Allen was transferred on to Wallens Ridge on April 1. According to Breeding, Allen submitted an informal grievance on April 11. (*Id.* ¶ 11 & Encl. B.) In it, he complained that Shelton "put him in for a transfer . . . in retaliation for taking legal action against institutional staff." (*Id.* ¶ 11.) Shelton responded to Allen's informal complaint, "stating that Allen was put in for a transfer due to receiving a score of 44 points on his Annual Review and that scoring 44 points made him eligible for a Security Level 5 facility." (*Id.*)  That response was returned to Allen, but Breeding does not specify how or when.

Breeding states that Allen followed up that informal complaint with a Regular Grievance "dated May 4, 2022, wherein he wrote that Unit Manager Shelton put in a transfer for him in retaliation for taking legal action against staff. However, Allen did not submit the Regular Grievance to the [Keen Mountain] Grievance Office as required by OP 866.1[.] Instead, he mailed it directly to the Regional Ombudsman . . . ." (*Id.* ¶ 12.) In a letter accompanying the Regular Grievance, Allen accused Breeding of repeatedly refusing to accept his grievances. (*Id.*) Regional Ombudsman Parr responded, advising Allen to submit the grievance to Keen Mountain. (*Id.* ¶ 13.)

When Allen submitted the Regular Grievance to Keen Mountain, he stated that, as a remedy, he wanted to "document the constitutional violation." (*Id.* Encl. C.) Breeding rejected the Regular Grievance at intake because, she said, it was a "request for services." (*Id.* ¶ 14.) Notably, on the form and in subsequent requests from Allen, Breeding never identified (1) what services she believed Allen was requesting, (2) to whom such a request for such "services" should have been directed, or (3) how Allen could remedy his filing so that it would be accepted at intake. Allen appealed the intake decision to the Regional Ombudsman, defendant Parr, but he upheld Breeding's decision. (*See id.* Encl. C.) As a result, according to Breeding, Allen never had a regular grievance accepted at intake, and therefore he never exhausted his administrative remedies. (*See id.* ¶ 7 ("Appealing the intake decision does not satisfy the exhaustion requirement.").)

In his response, Allen does not dispute the basics of Breeding's recitation of the facts, but he adds important context. As it relates to his informal complaint, he admits that he mailed it to Keen Mountain on April 11.[12] (Br. in Opp. ¶ B.1 [ECF No. 47-1].) But because Allen mailed it (and because Shelton took the entire time allowed under OP 866.1 to respond to it[13]), his 30-day window to file a regular grievance was closing while he awaited Breeding's response. In order to preserve his right to the grievance process, Allen placed a Regular Grievance in the mail (raising the same issues as the informal complaint) on April 28. (*Id.*

---

[12] Although Breeding likely could have cited Allen's failure to submit the grievance to the Grievance Mailbox at Wallens Ridge as a basis for rejecting the grievance, she didn't. Accordingly, the court places no emphasis on this perceived violation of OP 866.1. The grievance process is a labyrinth to begin with, and inmates should not have to defend against grounds never relied on by VDOC during the grievance process or during litigation.

[13] Breeding states that the informal complaint was dated April 11, 2022, and Shelton responded on April 25. (Breeding Aff. ¶ 11.)

¶ B.2.) On May 3, Allen received Shelton's response to his informal complaint, but because he had already submitted the Regular Grievance, he simply retained the response for his own records. (*Id.*)

According to OP 866.1, Breeding was required to issue a receipt to Allen for his Regular Grievance within 2 days (*see* Breeding Aff. Encl. A), but by May 10, Allen says he still had not received one. (Br. in Opp. ¶ B.5.) According to Allen, he "rewrote the grievance and mailed it to the regional ombudsman with an explanation of Breeding[']s failure to respond." (*Id.* ¶ B.5.)

Allen's Regular Grievance, the one he mailed on April 28, was stamped "Received" at Keen Mountain on May 9, 2022. On May 16, Allen received it back at Wallens Ridge; Breeding had rejected it at intake because Allen did not use the proper two-sided form. (*See* Allen Aff. ¶ B.6.) When Allen re-submitted the Regular Grievance on the correct two-sided form, Breeding rejected it because, she said, it was a "request for services." (*Id.* ¶ 10.) On appeal, that rejection was affirmed by the Regional Ombudsman Parr. (*Id.* ¶ 13.)

As noted, an inmate may not bring an action unless he has properly exhausted all administrative remedies. According to Shelton, Allen did not because: (1) he mailed a Regular Grievance to the Regional Ombudsman rather than to the Grievance Office at Keen Mountain; (2) his subsequent Regular Grievance was on an incorrect form; and (3) his grievance was a "request for services." Because none of these resulted in an exhausted grievance, Shelton contends Allen may not maintain this suit. The court disagrees and finds that the grievance process was "not available" to Allen.

First, as Allen makes clear, the mailing to the Regional Ombudsman was *not* an attempt to file a grievance; it was his efforts to report dilatory responses from Breeding.[14] The record confirms that, in an effort to *meet* the deadlines in OP 866.1, Allen submitted a timely Regular Grievance to Keen Mountain. Breeding rejected it because it was on a one-sided form rather than the "proper" two-sided form. But Allen's supplemental affidavit confirms that, if he used an incorrect form, it was because *that's what the prison officials gave him to use*:

> At Wallens Ridge State Prison the only access to forms that inmates have is by obtaining them from the pod officer. . . . At the time I filed the Apr. 27, 2022 grievance referencing my transfer, I requested a regular grievance from a [Wallens Ridge] pod officer who supplied my with a defective one-sided form. I had no other access to a regular grievance.

(Supp. Aff. of Karsten Allen ¶ 3, July 30, 2023 [ECF No. 59-1].) And when Allen resubmitted the Regular Grievance, Breeding bizarrely characterized it as a "request for services" and rejected it at intake. Regional Ombudsman Parr affirmed that decision, unfairly characterizing Allen's Regular Grievance as "fail[ing] to specify any incident—just a broad allegation. Nothing to investigate." (Aff. of Curtis Parr Ex. C, Dec. 21, 2022 [ECF No. 42-3].)[15]

A fair and objective review of Allen's Regular Grievance indicates that it was not a "request for services," despite the fact that, as relief, he asked that the violation be

---

[14] The court makes no judgment on the cause of the delay; in fact, it may have been due to Allen's use of the U.S. mail rather than the Grievance Mailbox at Wallens Ridge. But whatever the reason, the delay in responding to Allen was substantial.

[15] The narrative of Allen's Regular Grievance stated: "I was arbitrarily put in for transfer by Unit Manager Charlotte Shelton on April 1, 2022 as retaliation for taking legal action against institutional staff. This violates my 1st amendment right to petition the government for redress of grievances." (Parr Aff. Ex. C.)

documented.[16] Breeding tacitly admits this because at *no point*, even when asked by Allen, has she ever relayed what "services" Allen was requesting. Moreover, in contravention of OP 866.1, she failed to instruct Allen "how to remedy any problems with the grievance . . . ." (Breeding Aff. ¶ 7.) And Parr's explanation that there was "nothing to investigate" is simply absurd on its face.

While exhaustion of administrative remedies is mandatory, *see Bock*, 549 U.S. at 211, in some circumstances an inmate's administrative remedies may be determined to have been rendered "unavailable," but the plaintiff "must point to specific facts showing that officials prohibited or blocked his use of the grievance process." *Heard v. Allen*, No. 1:09-CV-119 (WLS), 2010 WL 3855235, at *4 (M.D. Ga., Aug. 12, 2010).

> Courts have found that such circumstances may include refusal of forms needed to pursue an institution's established grievance process; informing an inmate that a procedural step in the established administrative process need not or cannot be pursued; or threats of retaliation of a sufficient nature. *See, e.g., Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (holding that inmate was prevented from exhausting his administrative remedies when prison officials failed to respond to his requests for grievance forms, and that the inmate's failure to exhaust those remedies was not a bar to suit because they were not "available" to him); *Miller v. Tanner*, 196 F.3d 1190, 1194 (11th Cir. 1999) (inmate was not required to file an appeal after being told unequivocally, and in writing, that appeal was precluded; plaintiff produced memorandum denying grievance and informing plaintiff that no appeal was available); *Mosier v. Fla. Dept. of Corr.*, No. 5:11-cv-399-MP-GRJ, 2012 WL 3239385, at *4 (N.D. Fla., June 19, 2012) (An administrative remedy may be deemed

---

[16] The irrationality of Breeding's (and the Regional Ombudsman's) position is clear to the court; any inmate who requests that some corrective action be taken in response to wrongdoing requests a "service"—that their rights be vindicated.

> "unavailable for PLRA purposes if prison officials render pursuit of the remedy irrational through threats of substantial retaliation.") . . . .

*Minnis v. Jones*, No. 17-CIV-20575, 2017 WL 9605073, at *6 (S.D. Fla. Nov. 17, 2017).

Here, Allen was provided improper forms by VDOC officials and his Regular Grievance was rejected at intake as a "request for services" when it clearly was not. This improper rejection—and its affirmance on appeal as "just a broad allegation"—were tantamount to telling Allen that "the established administrative process . . . cannot be pursued." *Id.* VDOC cannot blithely reject a grievance at intake and then point to that facile decision to argue "the inmate did not exhaust." If the grievance department rejects a grievance for plainly incorrect (and indeed irrational) reasons, the administrative process was not available to the inmate "through no fault of his own." *Moore*, 517 F.3d at 725; *see also Davis v. Hernandez*, 798 F.3d 290, 295 (5th Cir. 2015) ("Grievance procedures are unavailable . . . if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process."). Surely an inmate cannot be expected to draft his grievances to ward off irrational and plainly incorrect interpretations of his filings. *See, e.g.*, *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) (noting that, if a prison "play[s] hide-and-seek with administrative remedies," then they are not "available"). Because VDOC thwarted Allen's efforts to exhaust his administrative process, the failure to exhaust will not bar his claim.

## 2. Merits Defense

When viewed in the light most favorable to Allen, the court concludes that a genuine issue of material fact precludes entry of summary judgment. The evidence conflicts as to why

Shelton recommended Allen's security-level increase and attendant transfer: was it because his poor disciplinary and behavioral record qualified him for it? Or was it to retaliate against him because he exercised his constitutional right to petition the courts? A jury will have to decide.[17]

"In order to state a colorable retaliation claim under § 1983, an inmate must plausibly allege: (1) that he engaged in activity protected by the First Amendment; (2) that the defendant took some action that adversely affected his First Amendment rights; and (3) that there was a causal relationship between the inmate's protected activity and the defendant's conduct." *Carter*, 2022 U.S. Dist. LEXIS 45721, at *11 (citing *Martin*, 858 F.3d at 249). In support of her motion, Shelton explains that she recommended Allen's change from SL4 to SL5 because he scored 44 points on the Security Reclassification Scoring Instrument, which placed him in the SL5 range under OP 830.2, Security Level Classification.[18] (Shelton Aff. ¶¶ 4–5.) On the basis of the established VDOC criteria, Shelton contends she recommended Allen's transfer to one

---

[17] Shelton contends she is entitled to the protections of qualified immunity, but on the present record, the court disagrees. Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly establish statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Evaluating a claim of qualified immunity involves a two-part test: (1) do the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) did the actions violate a clearly established right of which a reasonable person would have known?" *Trail v. Cressell*, 494 F. Supp. 3d 349, 357 (W.D. Va. 2020). Here, for the reasons discussed, Shelton's actions, if they are as Allen alleges, would have violated his constitutional right. As to the second prong, "[t]he law governing [the alleged] conduct was clearly established. Specifically, the law clearly established that [a] defendant[] cannot transfer a prisoner from one correctional institution to another in order to punish the prisoner for exercising his First Amendment rights to pursue civil rights litigation in the courts." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). Accordingly, a jury will have to decide whether Shelton's actions were (1) retaliatory or (2) in pursuit of a legitimate penological goal. On this record, the court cannot make that conclusion as a matter of law. *Cf. Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) ("Often, events have multiple but-for causes.").

[18] Allen's score was based, in large part, on his five 200 series and two 100 series disciplinary convictions during the relevant period. Only convictions—not mere charges—are factored into the security-level-scoring instrument. (*See* Shelton Aff. ¶ 12.) The validity of Allen's 2021 disciplinary convictions are not the subject of this lawsuit. Also contributing to Allen's SL5 designation was the fact that he had not held a job during the annual reporting period. (*Id.* ¶¶ 4–5.)

of the three facilities that house SL5 inmates, of which Wallens Ridge was one. (*Id.* ¶ 6.)[19] Allen's 2021 Annual Review corroborates Shelton's assertions. (*See* 2021 Annual Review.)

In opposition, Allen points to his 2021 Annual Review; his 2010, 2011, 2012, 2019, and 2020 Annual Reviews; various grievance forms and correspondence that he submitted complaining about his transfer (ECF No. 47-2); his Affidavit dated February 8, 2023 (ECF No. 47-3); and his supplemental Affidavit dated April 16, 2023 (ECF No. 52).[20] The crux of Allen's argument is that, although his disciplinary score qualified him as an SL5 inmate, Shelton should have exercised a security-level override to keep him at Keen Mountain (as Counselor Cox recommended), but did not to retaliate against him for suing her.

Allen claims that, in 2020, VDOC employee Counselor Yates used an SL4 override to keep him classified as SL4 and at Keen Mountain even though the Annual Review scoring instrument placed him at SL5. (*See* Allen's Mem. Opp'n Mot. Summ. J. 15); (Ex. L [ECF No. 47-2, 19–20] (In his 2020 Annual Review, Allen received 36 points but remained at SL4 based on "an L-4 override.").) The record reveals that Allen's 2020 Annual Review security level

---

[19] Shelton was also not the final decision maker on whether Allen was transferred; she only made a first-level recommendation that had to be and was approved by CCS (here, her recommendation was adopted by Beunaga). (*See* 2021 Annual Review at 2.) Pozeg subsequently approved Shelton's security-level increase. (*Id.*)

[20] At his request, Allen's brief in opposition (ECF No. 47-1) is also deemed verified, along with his supplemental affidavit (ECF No. 52). (*See* Order, Apr. 24, 2023 [ECF No. 53]); *see also* Allen's Mem. Opp'n Mot. Summ. J. at 2 ("Plaintiff submits a sworn affidavit and supporting evidence cited as 'attachments' in support of the contentions herein.").

Allen also "submit[ted] a verified complaint in which he declared, under penalty of perjury, that the information contained in his complaint was true and correct." *Canterbury v. Adkins*, No. 3:18-CV-01530, 2020 WL 1891687, at *9 (S.D. W. Va. Jan. 9, 2020), *R&R adopted*, No. 3:18-CV-01530, 2020 WL 901813 (S.D.W. Va. Feb. 25, 2020); (*see* Compl. ¶ 65 .) Allen's verified complaint is therefore treated as "the equivalent of an opposing affidavit for summary judgment purposes." *Id.* (quoting *Greene v. Feaster*, 733 F. App'x 80, 81 (4th Cir. 2018)).

override was recommended *by Shelton*—Allen's ICA—not Yates, a VDOC counselor.[21] During

Allen's 2020 Annual Review period, he had a lower security instrument score, received fewer

disciplinary infractions, held a job for part of the reporting period, and was enrolled or

waitlisted for various programs such as "Aggression Alternative Skills" and "Thinking for a

Change," (ECF No. 47-2, at 19–20), and *Shelton* determined that "it is believed that [Allen] can

be housed at his current Security Level 4 facility.":

---

**Security Level Review:**

The ICA recommends: Security Level change to 4 - Close

Rationale: Remain Security level 4, based on a score of 36 points with an L-4 override. Inmate is currently in General Population and is on the waiting list for Aggression Alternative Skills, Thinking for a Change, and the CBI-SA programs. It is believed that he can be housed at his current Security Level 4 facility.

ICA: Shelton,                                    Date: 12/22/2020
Charlotte L

**Administrative Review:**

Decision: Approve                    Security Level change to 4 - Close

Page 1 of 2                                          Rev. 04/15/2010

ATTATCHMENT L (CONT'A)

Shelton, Charlotte            Date: 12/22/2020
L

Comments: Remain Security level 4, based on a score of 36 points with an L-4 override. Inmate is currently in General Population and is on the waiting list for Aggression Alternative Skills, Thinking for a Change, and the CBI-SA programs. It is believed that he can be housed at his current Security Level 4 facility.

---

(*Id.*)[22] Allen claims that Shelton's refusal to utilize a security-level override in 2021 was to

retaliate against him for suing her and her colleagues, since filing his lawsuits is, according to

him, the only thing that changed from 2020 to 2021.

    This case turns on causation. Allen may demonstrate causation by establishing (1) facts

suggesting that the adverse action (his transfer) occurred because of the protected activity (his

---

[21] It appears that counselor recommendations are either not listed on the ICA Annual Review Hearing record, or at least not by name.

[22] Allen also includes his 2019 Annual Review, showing that he had a security level score of 32 and was classified as SL4, with the benefit of an override from his ICA from that year—T. S. Foreman. (ECF No. 47-2, at 26–27.)

lawsuits) or (2) that the adverse act bears sufficient temporal proximity to the protected activity. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021). The inference of causation may be strongest when both temporal proximity and evidence of other facts exist. *See, e.g., Roberts*, 998 F.3d at 126; *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021).

In the analogous Title VII retaliation context, there is no bright-line rule for how close temporal proximity must be between protected activity and an adverse action to *prima facie* establish the causation element when it is relied on exclusively—but it must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (same). For example, courts in this circuit have found that a three-month lapse "is insufficient to infer a causal relationship without other evidence of a causal link." *Roberts*, 998 F.3d at 127 (affirming district court's granting the defendant summary judgment) (citing *King v. Pulaski Cnty. Sch. Bd.*, 195 F. Supp. 3d 873, 886 (W.D. Va. 2016)). The Fourth Circuit has also reasoned that, absent other evidence of a causal relationship, "a lapse of two months between the protected activity and the adverse action is sufficiently long so as to weaken significantly the inference of causation." *Roberts*, 998 F.3d at 127 (quoting *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005)) (cleaned up).

The court takes judicial notice of the fact that, on October 6, 2021, the court ordered the Clerk to attempt to serve Shelton and other defendants in one of Allen's other since-dismissed lawsuits (*see* Order, *Allen v. Sater*, 7:21-cv-230 (W.D. Va. Oct. 6, 2021) [ECF No. 11]), that Shelton and other defendants received a waiver of service on the same date, and that, on November 4, 2021 the defendants, through counsel, filed a Waiver of Service for Shelton

and others in that case (*see id.* ECF No. 16). Then, on December 9, 2021, more than two months after Shelton became aware of Allen's lawsuit against her, Shelton conducted Allen's 2021 Annual Review and recommended his transfer.

Standing alone, as in *Horne*, the approximately-two-month interval between Shelton learning that Allen had sued her and others and her recommendation that Allen be transferred would be "sufficiently long so as to weaken significantly the inference of causation." 154 F. App'x at 364 (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). But Allen is not relying solely on temporal proximity; rather, he relies on Shelton's own words: "I told you I was going to get you." (Compl. ¶ 38.) This *direct* evidence of her motive is more than sufficient, at this stage, to raise a genuine dispute of material fact and preclude summary judgment.

Shelton places a great deal of emphasis on Allen's Security Reclassification Scoring Instrument, arguing that, on the basis of Allen's score, he was properly counted as an SL5. That may very well be so. But Allen's scoring does not nullify the evidence that she threatened Allen ("I'll get you eventually") and that, once his transfer to a higher-security facility was finalized and Allen was being transferred, she said to him, "I told you I would get you." (Compl. ¶¶ 31, 38.) Regardless of the scores—or any other evidence in the record—this fact precludes summary judgment because, if a jury believes Allen's testimony, Shelton's admission is sufficient to establish Allen's claim that Shelton initiated his transfer in retaliation for his exercise of his First Amendment rights.

## IV.   CONCLUSION

The evidence is simply insufficient to permit any of Allen's claims against Pozeg, Beunaga, Breeding, or Parr to proceed, but the evidence as to Shelton's motives for

transferring Allen raises a genuine dispute of material fact as to Allen's claim of retaliation against her, so that claim will proceed to trial.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 29th day of September, 2023.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE